1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11 BRYAN RUSSELL PENDERGAST,                )  Case No.: 1:16-cv-00552 - JLT
                                                            )
12            Plaintiff,                              )  ORDER REMANDING THE ACTION PURSUANT
                                                            )  TO SENTENCE FOUR OF 42 U.S.C. § 405(G)
13       v.                                             )
                                                            )  ORDER DIRECTING ENTRY OF JUDGMENT IN
14 NANCY A. BERRYHILL[1],                    )  FAVOR OF PLAINTIFF BRYAN RUSSELL
   Acting Commissioner of Social Security,  )  PENDERGAST AND AGAINST DEFENDANT
15                                                         )  NANCY A. BERRYHILL, ACTING
              Defendant.                            )  COMMISSIONER OF SOCIAL SECURITY
16 _____ )

17            Bryan Russell Pendergast asserts he is entitled to a period of disability and disability insurance

18 benefits under Title II of the Social Security Act.  Plaintiff seeks judicial review of the decision denying

19 his application for benefits, asserting the administrative law judge erred in evaluating the medical

20 record.  Because the ALJ failed to apply the proper legal standards, the matter is **REMANDED** for

21 further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

22                                          **BACKGROUND**

23            Plaintiff filed applications for benefits on July 3, 2012, in which he alleged disability beginning

24 November 6, 2009.  (Doc. 11-3 at 18)  The Social Security Administration denied the applications at

25 the initial level and upon reconsideration.  (*Id.*; Doc. 11-5 at 2-11)  Plaintiff requested a hearing, and

26 testified before an ALJ on July 31, 2014.  (Doc. 11-3 at 18, 33)  The ALJ determined Plaintiff was not

27

28            [1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule 25(d) of the Federal
Rules of Civil Procedure, the Court substitutes Nancy A. Berryhill for her predecessor, Carolyn W. Colvin, as the defendant.

disabled under the Social Security Act, and issued an order denying benefits on September 17, 2014. (*Id.* at 18-26)  Plaintiff filed a request for review of the decision with the Appeals Council, which denied the request on February 22, 2016.  (*Id.* at 2-4)  Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act.  When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error.  42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion."  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).  The burden of proof is on a claimant to establish disability.  *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).  If a claimant establishes a prima facie case of disability,

2

1    the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial

2    gainful employment.  *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

3                                   **ADMINISTRATIVE DETERMINATION**

4            To achieve uniform decisions, the Commissioner established a sequential five-step process for

5    evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f).  The process requires

6    the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of

7    alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the

8    listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had

9    the residual functional capacity to perform to past relevant work or (5) the ability to perform other work

10   existing in significant numbers at the state and national level.  *Id.*  The ALJ must consider testimonial

11   and objective medical evidence.  20 C.F.R. §§ 404.1527, 416.927.

12   **A.      Relevant Medical Evidence**

13           In 2007, Plaintiff worked as a UPS driver and developed right hip pain, though he did "not

14   recall a particular injury." (Doc. 11-9 at 39)  Dr. Thomas W. Thomas opined Plaintiff was "severely

15   disabled" at the time due to "joint space narrowing, sclerosis, and periarticular ostephytes."  (*Id.*)

16   Plaintiff had "a right total hip arthroplasty," followed by "aggressive physical therapy."  (*Id.* at 36)  At

17   a follow-up appointment in January 2008, Plaintiff reported he was "doing well" and had "no pain" or

18   functional limitations.  (*Id.* at 32)  Dr. Thomas opined Plaintiff's range of motion was good, and

19   Plaintiff was "[r]eleased to return to work" on January 26, 2008.  (*Id.* at 32)

20           In February 2011, Plaintiff returned to Dr. Thomas, reporting he had pain in both hips and

21   "some pain down his low back the right side."  (Doc. 11-9 at 25)  Plaintiff told Dr. Thomas he had

22   "been out of work" for the past year after losing his job with UPS.  (*Id.*)  Dr. Thomas ordered x-rays

23   and found Plaintiff had "some slowly advancing [osteoarthritic] changes to the left hip."  (*Id.* at 26)

24   The following month, Dr. Thomas also ordered images of Plaintiff's lumbar spine, and found the L5-S1

25   level was "almost completely bone-on-bone with some large bone spurs."  (*Id.* at 23-24)

26           In May 2011, Plaintiff had an MRI on his lumbar spine.  (Doc. 11-8 at 81)  Dr. Phillip Tran

27   found "evidence of moderate degenerative disc disease with broad-based disc protrusion or bulge and

28   mild central canal stenosis as well as mild to moderate bilateral foraminal narrowing" at the L5-S1

                                                        3

level.  (*Id.*)  Dr. Tran also opined Plaintiff had "mild central canal stenosis" at the L4-L5 level.  (*Id.*)

In June 2011, Dr. Gregory Dunford began treating Plaintiff for low back pain and "numbness in both legs."  (Doc. 11-8 at 31)  Dr. Dunford noted Plaintiff had "a shot in the left hip" and was taking physical therapy.  (*Id.*)  He observed that Plaintiff arose from his chair slowly, and demonstrated "[m]ild tenderness and spasm of [the] lumbar paraspinal muscles."  (*Id.*)  Dr. Dunford determined Plaintiff did not have "percussion tenderness," and walked normally on his toes and heels.  (*Id.*)

Plaintiff reported the shot in his mid-back provided "moderate relief" in July 2011.  (Doc. 11-8 at 30)  Dr. Dunford found Plaintiff had "[f]airly exquisite tenderness and spasm of lumbar paraspinal muscles bilaterally," and his "[f]lexion [was] still limited due to pain."  (*Id.*)  He recommended that Plaintiff follow-up with another physician regarding an injection in his low back where the pain was the worst.  (*Id.*)  In addition, Dr. Dunford told Plaintiff to apply heat and perform range of motion exercises.  (*Id.*)

Despite receiving additional injections, Plaintiff reported "persisting pains in [his] low back" in August and September of 2011.  (Doc. 11-8 at 28-29)  Dr. Dunford found Plaintiff's flexion was "limited to knees with no reversal of lumbar lordosis."  (*Id.*)  Plaintiff continued to have tenderness and spasm in the lumbar paraspinal muscles.  (*Id.*)

In October 2011, Plaintiff told Dr. Dunford that he was "[s]till quite inactive due to the low back pain."  (Doc. 11-8 at 27)  Plaintiff said he had "[p]ain the right shoulder after throwing a Frisbee" the prior week.  (*Id.*)  Dr. Dunford found Plaintiff had a full range of motion in his back, though there was tenderness in the lumbar spine.  (*Id.*)  Dr. Dunford advised Plaintiff regarding hypertension, and noted his blood pressure had improved with a salt limitation.  (*Id.*)

Plaintiff had a neuroablation treatment with a neurosurgeon in November 2011.  (Doc. 11-8 at 26, 65)  He told Dr. Dunford that his pain was "actually a little worse after [the] procedure."  (*Id.* at 24)  Dr. Dunford found Plaintiff had "general tenderness over the lumbar paraspinals with poor [range of motion] on forward and lateral flexion due to pain."  (*Id.*)

From December 2011 to February 2012, Plaintiff had several physical therapy sessions with Peter Erickson.  (Doc. 11-8 at -17)  On December 14, 2011, Mr. Erickson observed Plaintiff could not "lift, bend, twist, or sustain prolonged postures in any plane." (*Id.* at 17, 24)  Plaintiff told Mr. Erickson

4

that he was limited to about one hour of activity due to low back pain, and was "[d]iscouraged by [his] limited endurance and activity level." (*Id.* at 17) Mr. Erickson observed that Plaintiff moved "in a guarded fashion," with "diminished bilateral stride length" and a "very strong pelvic tilt." (*Id.*) He found Plaintiff's sensation was "intact" in his legs, and despite the "[d]iminished hip mobility," the "muscular mobility [was] fairly good." (*Id.*) Mr. Erickson noted that he provided Plaintiff with "[t]raining regarding protection of [his] lumbar spine." (*Id.*)

Plaintiff told Dr. Dunford that his physical therapy sessions were "helping his hip pains quiet well" in January 2012. (Doc. 11-8 at 23) However, Dr. Dunford found Plaintiff continued to exhibit "general tenderness over the lumbar paraspinals with poor [range of motion] on forward and lateral flexion due to pain." (*Id.*) In addition, Plaintiff "had 4+/5 weakness in his quadriceps and hamstrings bilaterally." (*Id.* at 37) Plaintiff's "[s]ensation was intact to light touch and negative for straight leg raising signs." (*Id.*) An MRI of Plaintiff's lumbar spine showed "disc protrusion centrally at L4-L5, severe disc collapse at L5-S1, Modic II endplate changes and large anterior spurs, and mild stenosis." (*Id.*) Plaintiff was then referred to Dr. Henry Aryan for a surgical consultation. (*Id.*)

On February 1, 2012, Plaintiff told Mr. Erickson that he was "[f]eeling much better while completing [physical therapy]." (Doc. 11-8 at 13) However, Plaintiff said that he "tried to rake [his] yard and [his] back started hurting a lot." (*Id.*) Mr. Erickson noted that Plaintiff was improving his stabilization. (*Id.*) Although Plaintiff had "pain with awkward positions," he was "[a]ble to recognize protected positions." (*Id.*) Mr. Erickson noted that he again provided Plaintiff with "[t]raining regarding protection of [his] lumbar spine." (*Id.*)

In mid-February 2012, Plaintiff sought emergency care for "pain in the right shoulder," and received a prescription for Vicodin. (Doc. 11-8 at 22) On February 23, Dr. Dunford found Plaintiff had tenderness in the right shoulder, but his deltoid strength was "100% with mild pain on stress." (*Id.*) In addition, Dr. Dunford found Plaintiff had a full range of motion in the shoulder. (*Id.*)

Dr. Aryan performed a consultative examination regarding Plaintiff's "[l]ow back pain, bilateral lower extremity radiculopathy, and progressive paraparesis" on March 15, 2012. (Doc. 11-8 at 39) Dr. Aryan noted Plaintiff had received physical therapy, injections, and radiofrequency ablation, but "failed essentially all… conservative measures." (*Id.*) Dr. Aryan found Plaintiff had "4/5 weakness for

5

1    bilateral dorsiflexion and plantar flexion," but found no muscle atrophy.  (*Id.* at 40)  Plaintiff also

2    demonstrated "numbness in an L5 and S1 distribution bilaterally."  (*Id.*)  Dr. Aryan concluded Plaintiff

3    had "two level disease, moderate to severe at L5-S1, and mild to moderate at L4-5, with associated

4    neurologic deficits, progressive in nature." (*Id.* at 41)  Dr. Aryan recommended Plaintiff have "an L4 to

5    S1 instrumented fusion and decompression."  (*Id.*)

6           In April 2012, Plaintiff told Dr. Dunford that he continued to have "significant low back pains

7    with radiation into the legs."  (Doc. 11-8 at 21)  In addition, Plaintiff said his pain in the shoulder was

8    "about 75% improved."  (*Id.*)

9           Plaintiff had a two-level lumbar fusion from L4 to S1 performed by Dr. Aryan on July 16, 2012.

10   (Doc. 11-8 at 51)  The same month, Plaintiff developed "soreness and swelling" in his right wrist.  (*Id.*

11   at 19)  Dr. Josephine Perez found Plaintiff exhibited pain with "any movement" and his wrist was

12   "warm to touch." (*Id.*)  Plaintiff was "[a]ble to make a nearly closed fist, but [had] a weak grip due to

13   pain and swelling." (*Id.*)  Following testing, Plaintiff was diagnosed with carpal tunnel syndrome.  (*See*

14   Doc. 11-9 at 61)

15          At a follow-up appointment with Dr. Aryan on July 30, 2012, Plaintiff reported that "the pain he

16   was having prior to surgery… [was] resolved."  (Doc. 11-8 at 50)  Plaintiff described having tightness

17   in his hamstrings, but stated he did not have any numbness or weakness in his legs.  (*Id.*)  Dr. Aryan

18   noted Plaintiff appeared "very pleased with the outcome thus far," and opined Plaintiff was "doing

19   quite well." (*Id.* at 50-51)

20          In August 2012, Plaintiff continued to deny having any symptoms in his legs, but "still [had]

21   quite a bit of soreness in his back.  (Doc. 11-8 at 53)  Dr. Aryan recommended Plaintiff start physical

22   therapy, and start weaning out the use of his lumbar brace.  (*Id.* at 54)

23          Plaintiff had physical therapy with Mr. Erickson from September to November 2012.  (*See id.*

24   Doc. 11-8 at 101, 109) In September, Plaintiff was "very limited in activity level" because he could not

25   "lift, bend, twist, or sustain prolonged postures in any plane," and he had "[d]ifficulty standing upright

26   for prolonged periods."  (*Id.* at 109)  Mr. Erickson observed that Plaintiff moved "in [a] guarded

27   fashion" with a "diminished bilateral stride length."  (*Id.*)

28          In October 2012, Plaintiff told Mr. Erickson that he had been noticing some "real change over

the past few weeks" and was feeling encouraged.  (Doc. 11-8 at 103) Mr. Erickson believed that Plaintiff was "[i]mproving overall," aside from reported "left hip bursa pain/welling."  (*Id.* at 103) Likewise Dr. Aryan believed Plaintiff had "come a long way, although [he] still [had] some improvement to make."  (*Id.* at 91)

At the final physical therapy session on November 12, 2012, Plaintiff reported his low back was "feeling a lot better" and his leg symptoms were "nearly resolved."  (Doc. 11-8 at 101)  Mr. Erickson believed Plaintiff made "[f]ine gains in muscular mobility, functional strength, core strength, protection of fusion, and endurance."  (*Id.*)  He observed also that Plaintiff had "[de]greasing muscle guarding, strength with stabilization, and improving comfort.  (*Id.*)

Dr. J. Frankel reviewed the record and completed a physical residual functional capacity assessment on November 20, 2012.  (Doc. 11-4 at 14-18)  Dr. Frankel opined that after the lumbar fusion, Plaintiff was able to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk "[a]bout 6 hours in an 8-hour workday; and sit "[a]bout 6 hours in an 8-hour workday." (*Id.* at 16-17)  Dr. Frankel believed Plaintiff had postural limitations, but could frequently crawl, balance, stoop, crouch, and climb ramps and stairs.  (*Id.*)  In addition, Dr. Frankel opined that Plaintiff could occasionally climb ladders, ropes, and scaffolds.  (*Id.* at 17)  Dr. Frankel concluded Plaintiff was required to "avoid uneven terrain" and "[a]void concentrated exposure" to hazards such as machinery and heights, but had no other environmental, manipulative, or visual limitations.  (*Id.* at 16, 18)

Dr. Joy Rodriguez began treating Plaintiff in December 2012.  (Doc. 11-9 at 61)  Plaintiff told Dr. Rodriguez that he had pain in his left hip, which "ache[d] all the time."  (*Id.*)  In addition, he said physical therapy made the pain "worse" and it "hurt[] to move wrong."  (*Id.*)  Dr. Rodriguez observed that Plaintiff moved all his extremities "well," but had pain "with adduction across the midline" of his left hip, as well as "[m]inimal pain with internal rotation of the hip."  (*Id.*)  She advised Plaintiff regarding stretches and range of motion exercises, and referred him again to physical therapy.  (*Id.*) Dr. Rodriguez tested Plaintiff's blood sugars and cholesterol, and diagnosed him with diabetes mellitus and hypertension.  (*Id.* at 59)

In January 2013, Plaintiff reported that he "was unable to get back to therapy due to insurance reasons and…[asked] for another prescription of that" from Dr. Aryan.  (Doc. 11-9 at 8)  Plaintiff said

1    he was "off of narcotic pain medications," but his back gave "him trouble especially when it is cold

2    outside or when he is more active." (*Id.*)  In addition, Plaintiff said he had "some tingling sensation and

3    tightness feeling in his plantar feet bilateral," which was "worse at night," but "not severe enough for

4    medication or other treatment." (*Id.*)  Nick Marinakis, PA-C, found Plaintiff had "5/5 motor strength of

5    the lower extremities with straight leg raising signs causing back pain but not leg pain." (*Id.* at 9)

6         Plaintiff had an eye exam due to his diabetes diagnosis in February 2013, and had no

7    retinopathy.  (Doc. 11-9 at 57)  The following month, he told Dr. Rodriguez that he was "watching his

8    diet" and "tried to exercise but his hip hurt too much." (*Id.*)  Dr. Rodriguez noted Plaintiff lost

9    approximately twenty pounds since his last visit, and moved all his extremities well. (*Id.*)

10        Dr. Lavanya Bobba reviewed the record and completed a residual functional capacity

11   assessment on May 17, 2013.  (Doc. 11-4 at 34)  Dr. Bobba opined Plaintiff was "limited to a light RFC

12   [with] postural limitations," including occasionally climbing ladders, ropes, and scaffolds; stooping;

13   crouching; and crawling. (*Id.* at 37, 39)  In addition, she believed Plaintiff could frequently balance,

14   kneel, and climb ramps or stairs. (*Id.* at 37)  Dr. Bobba concluded also that Plaintiff was required to

15   avoid uneven terrain and concentrated exposure to hazards. (*Id.* at 38)

16        In June 2013, Plaintiff reported "he went off his diet for about a month when he moved," and

17   ate a "lot of fast food." (Doc. 11-9 at 55)  Dr. Rodriguez found Plaintiff's diabetes was not as well

18   controlled, but he did not need insulin. (*Id.* at 55-56)  Plaintiff reported he was till "unable to exercise

19   because his hip [kept] hurting more and more," and his insurance denied the request for physical

20   therapy. (*Id.* at 55)  Upon examination, Dr. Rodriguez opined Plaintiff continued to move his arms and

21   legs well. (*Id.*)

22        In August 2013, Plaintiff returned to the Sierra Pacific Orthopaedic Spine Center—where he

23   had right hip surgery in 2007—due to his complaints of left hip pain.  (Doc. 11-9 at 20)  Plaintiff told

24   Ken Bangs, NP, that he had difficulty putting on his shoes and socks, climbing stairs, and standing for

25   long periods. (*Id.*)  Mr. Bangs observed that Plaintiff could "rise[] from a sitting position and

26   ambulate[] without difficulty." (*Id.*)  In addition, Plaintiff had "good range of motion and strength in

27   the left hip." (*Id.*)  However, Mr. Bangs found the left hip was "exquisitely point tender along the

28   greater trochanter." (*Id.*)  He recommended a cortisone injection to treat the pain. (*Id.* at 22)

1    Plaintiff told Dr. Rodriguez in September 2013 that the cortisone injection "helped" with the

2    pain, and he began exercising in the pool. (Doc. 11-9 at 50) Plaintiff said he stopped checking his

3    blood sugar levels because the strips were too expensive, but reported that he "went back on a good

4    diet." (*Id.*) Dr. Rodriguez determined Plaintiff had a normal gait and he was able to move "all

5    extremities well." (*Id.*)

6    In December 2013, Plaintiff informed Dr. Rodriguez that he "ran out of strips" to check his

7    sugar levels, but was "trying to follow a good diet." (Doc. 11-9 at 48) He also told Dr. Rodriguez that

8    he was "not currently exercising due to hip and knee pain." (*Id.*) Dr. Rodriguez opined Plaintiff did

9    not appear in "acute distress" and was able to "move[] all extremities well." (*Id.*) Further, Plaintiff

10   continued to have a normal gate without a limp. (*Id.*) Dr. Rodriguez opined Plaintiff had "great

11   control" over his diabetes. (*Id.* at 49)

12   Plaintiff again reported he was not checking his sugar levels in March 2014. (Doc. 11-9 at 46)

13   He told Dr. Rodriguez that he had "cut out soda, sweets and breads and [was] cutting portion sizes."

14   (*Id.*) In addition, he said he was "not currently exercising due to hip and knee pain" but was doing

15   warm-ups in a pool. (*Id.*) Dr. Rodriguez found Plaintiff continued to have a "normal" gait and station,

16   and his senses were intact. (*Id.*) She opined Plaintiff had "great control" over his diabetes, but directed

17   Plaintiff to "[p]eriodically monitor sugars and blood pressure." (*Id.* at 47) Dr. Rodriguez referred him

18   to physical therapy to receive "functional capacity testing for disability." (*Id.*)

19   Dr. Tha Cha administered the functional capacity tests on June 27, 2014. (Doc. 11-9 at 69-81)

20   Dr. Cha found Plaintiff had "tenderness with withdrawal in [his] lumbar spine at L3-4 levels and

21   tenderness… in the upper lumbar, sacroiliac region and gluteal muscles." (*Id.* at 70) In addition, he

22   found Plaintiff had decreased ranges of motion with flexion and extension of the lumbar spine. (*Id.*)

23   Plaintiff reported that on a scale of "zero to 10, with zero indicating no pain and 10 indicating the worse

24   possible pain," his pain was "at best" a "3/10" and averaged "5/10," with the worst pain he experienced

25   being "8/10" (*Id.* at 73) Plaintiff was "able to stand for 22 minutes and 53 seconds before changing

26   position due to pain," and his straight leg raising tests were negative. (*Id.* at 70) Although Plaintiff

27   believed "he could lift about five pounds safely," Dr. Cha noted that Plaintiff was able to lift 20 pounds

28   from the ground. (*Id.* at 71-72) Dr. Cha determined Plaintiff did not have "any neurological findings

9

on physical examination." (*Id.* at 70; *see also id.* at 75-77)  According to Dr. Cha, Plaintiff could never be required to balance, but could frequently reach over head, reach forward, squat, and bend; and occasionally kneel, climb stairs and crawl.  (*Id.* at 70)  Dr. Cha concluded: "Overall the patient should be able to perform light duties at an occasional level or sedentary duties frequently."  (*Id.*)

On July 25, 2014, Plaintiff and his wife went to Dr. Rodriguez "to discuss his disability status and to have paperwork completed."  (Doc. 11-9 at 83)  Dr. Rodriguez noted Plaintiff's wife also participated in the office visit, and she reported that after the functional capacity testing, Plaintiff "completely debilitated for four days afterwards (unable to even get out of bed), and [had] still not completely recovered to his baseline despite the test being about 4 weeks [prior]."  (*Id.*)  In addition, Dr. Rodriguez noted:

> He is very limited in any activity.  His wife states he tries to help around the house.
> However, if he puts away laundry one day, he is in severe pain the next day.  Similarly,
> he might try to mow his law, but then he will be laid up several days afterwards.  They
> are concerned because he has been unable to work for at least 5 years.  If he does go
> back to work, they are afraid that one day of full time work would lay him up the rest of
> the week.  In a typical day just at home, he is usually requiring an hour or so of lying
> down every 2 or 3 hours due to pain and fatigue.  He can only sit about 20 minutes or
> so at a time.  If he tries to do anything that requires him to stand awhile, he must take a
> 5 or 10 minute break every 15 to 20 minutes.
>
> He is also very limited in the use of his right hand.  He is right handed.  However, he
> cannot completely close the hand and he has almost no strength in it.  He cannot open a
> jar or turn a doorknob with his right hand.  He has very limited fine motor movement in
> that hand and it is difficult to write.

(*Id.*)  Further, Plaintiff told Dr. Rodriguez that he had "significant stress" over his pain and "use[d] medical marijuana," but said it did not eliminate the pain.  (*Id.*)  Dr. Rodriguez found upon examination that Plaintiff's grip strength was "weak" on the right hand "but strong on left."  (*Id.* at 84)  In addition, she found Plaintiff's senses were "decreased to light touch on the toes and sold of both feet," and he had a positive straight leg raise test on the left.  (*Id.*)

Dr. Rodriguez also completed the physical residual functional capacity assessment requested by Plaintiff on July 25, 2014.  (Doc. 11-9 at 64-67)  She noted that Plaintiff had been diagnosed with "Diabetes mellitus, hyperlipidemia, carpal tunnel syndrome, hypertension, [and] chronic back pain," and the conditions were expected to be "[l]ife-long without resolution."  (*Id.* at 64)  Dr. Rodriguez indicated Plaintiff exhibited the following symptoms: "Stiffness. SI tenderness. Forward flexion limited

to 60°, backwards 5° to right 20° to left 25° but severe pain [with] movement. Parenthesias to toes & sole of both feet." (*Id.*)  According to Dr. Rodriguez, Plaintiff could frequently lift and carry less than 5 pounds, occasionally 5 pounds, rarely 10 pounds, and never 15 pounds or more.  (*Id.* at 64-65)  She noted Plaintiff did not have problems with balancing while walking, but opined could not walk more than one city block without severe pain or needing to rest.  (*Id.* at 65)  Dr. Rodriguez believed Plaintiff needed to recline or line down about three hours a day, could sit less than one hour in an eight-hour day, and stand less than one hour a day.  (*Id.*)  Dr. Rodriguez opined that Plaintiff had significant limitations with grasping, twisting, turning, fingering, and reaching with his right hand; and he could not climb ladders, scaffolds, or ropes.  (*Id.* at 66)  She concluded Plaintiff would require unscheduled breaks "[e]very 15 to 20 minutes," be "off task" for more than 30% of a workday due to his limitations, and would be likely to miss more that give days a month.  (*Id.* at 66-67)

**B.      Administrative Hearing Testimony**

Plaintiff testified before the ALJ at a hearing on July 31, 2014.  (Doc. 11-3 at 33)  He reported that he attended college for three years and had about 42 transferable units, but did not receive a certificate or degree.  (*Id.* at 38-39)  Plaintiff said he last worked as a delivery driver for UPS, and stopped working when he "was let go" for failing a drug test in November 2009.  (*Id.* at 39-40)  He believed he was no longer able to work, staying:

> I can't lift. I can only lift 20 pounds, at the most.  I can't stand very long.  I can't sit very long.  But I've got carpal tunnel in both hands and just I can't do anything for very long.  The same thing over and over, just it's tough to do things for a long period of time or any period of time, period.  My left hip, if I walk too much it just aches and it just really aches and burns and my feet go numb.

(*Id.* at 40)  Plaintiff explained that if he did "too much one day, the next day [he] can't do anything." (*Id.* at 41)

Plaintiff estimated that he was able to stand "about 30 minutes, 40 at the most" at one time before his feet hurt and he had "aching pain."  (Doc. 11-3 at 46)  In addition, he believed he could walk half a block at one time, and "a block-and-a-half" total in an eight-hour day, which he believed would take him 40 minutes to walk.  (*Id.*)  Plaintiff reported that sitting also caused him pain, and said he could sit "20/25 minutes at the most" at one time, and "two hours maybe" in an eight-hour period.  (*Id.* at 46-47)  Further, Plaintiff said he had problems using his right hand, including holding items,

11

1   reaching up, and gripping.  (*Id.* at 47-48)  For example, Plaintiff said he could not "pick up a fork" if

2   his hand was feeling "really sore."  (*Id.* at 48)

3        Vocational expert Thomas Dachelet ("the VE") also testified at the hearing and reported that

4   under the *Dictionary of Occupational Titles*[2], Plaintiff's past relevant work was classified as a "a route

5   driver, DOT 904.383-014.  (Doc. 11-3 at 53)  According to the VE, the Dictionary defined the job as

6   requiring medium exertion, but Plaintiff performed it at a "very heavy" level.  (*Id.*)

7        The ALJ asked the VE to assume a "hypothetical individual [with] the same vocational profile"

8   as Plaintiff.  (Doc. 11-3 at 53)  The ALJ stated the person could "occasionally lift and carry up to 50

9   pounds, up to 25 pounds frequently; stand and walk approximately si[x] hours; sit approximately six

10  hours."  (*Id.*)  In addition, the person could "frequently climb ramps and stairs; occasionally climb

11  ladders, ropes and scaffolds; frequently balance/kneel; occasionally stoop, crouch and crawl."  (*Id.*)

12  Further, the individual was required to "avoid extreme cold temperatures" and "avoid concentrated

13  exposure to workplace hazards such as unprotected heights, fast-moving machinery and traversing

14  uneven or slippery terrain."  (*Id.*)  The VE opined such a person could not perform Plaintiff's past

15  relevant work due to the limitations with lifting, climbing, stooping, and crawling.  (*Id.* at 53-54)

16  However, the VE reported there were other unskilled jobs that required light or medium exertion that

17  the individual could perform.  (*Id.* at 54)  For example, the VE identified the following positions:

18  bagger, DOT 920.687-014; package sealer machine operator, DOT 920.685-074; and laundry worker,

19  DOT 369.687014.  (*Id.* at 54-55)

20       Next, the ALJ asked the VE to consider an individual who could "only lift and carry 20 pounds

21  occasionally and 10 pounds frequently, along with all the other previously described restrictions."

22  (Doc. 11-3 at 55)  The VE opined the individual could not perform Plaintiff's past work, but could

23  perform other "light and unskilled" work including: palletizer, DOT 929.687-054; garment sorter, DOT

24  222.687-014; and automatic package operator, DOT 920.685-082.  (*Id.* at 55-56)  The VE also reported

25  an individual who was limited to "frequent bilateral handling, fingering and feeling" would be able to

---

27      [2] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training

28  Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990). The DOT classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner. 20 C.F.R. § 404.1566(d)(1).

1   perform all the jobs identified.  (*Id.* at 56)

2       Plaintiff's counsel asked the VE to consider a hypothetical individual with the limitations

3   identified by Dr. Cha, who was "limited to performing light work… occasionally one-third of the day"

4   or "sedentary duties frequently for two-thirds of the day, one of the other."  (Doc. 11-3 at 57-58)  The

5   VE testified that if the person was "away from the sedentary for a third of the day, off task, [then] work

6   doesn't exist."  (*Id.* at 58)

7   **C.    The ALJ's Findings**

8       Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial

9   activity after the alleged onset date of November 6, 2009.  (Doc. 11-3 at 20)  Second, the ALJ found

10  Plaintiff had the following severe impairments: lumbar degenerative disc disease, status post-lumbar

11  fusion L4 to S1; post-laminectomy syndrome; lumbar radiculopathy; left hip, greater trochanter

12  bursitis/arthritis, status post right total hip arthroplasty; and bilateral carpal tunnel syndrome.  (*Id.*)

13  These impairments did not meet or medically equal a listed impairment.  (*Id.* at 20-21)  Next, the ALJ

14  determined:

15      [T]he claimant has the residual functional capacity to perform light work as defined in
        20 CFR 404.1567(b) except within an 8-hour workday, the claimant can … lift and/or
16      carry 20 pounds occasionally and 10 pounds frequently.  He could sit 6 hours, and stand
        and/or walk 6 hours in an 8-hour workday.  He can frequently climb ramps and stairs;
17      occasionally climb ladders, ropes, or scaffolds; frequently balance; frequently kneel;
        occasionally stoop, crouch, or crawl.  The claimant should avoid concentrated exposure
18      to extremely cold temperatures, unprotected heights, moving machinery, and uneven or
        slippery terrain.  He can frequently engage in bilateral handling, fingering and feeling.

19

20  (*Id.* at 21)  With this residual functional capacity, the ALJ found Plaintiff was "unable to perform any

21  past relevant work."  (*Id.* at 24)  However, the ALJ determined there were "jobs that exist in significant

22  numbers in the national economy that the claimant can perform."  (*Id.* at 25)  Therefore, the ALJ

23  concluded Plaintiff was not disabled as defined by the Social Security Act.  (*Id.* at 26)

24                      **DISCUSSION AND ANALYSIS**

25      Plaintiff argues that the ALJ erred in evaluating the medical record, including evaluating the

26  opinions of Drs. Rodriguez and Cha.  (Doc. 14 at 8-14)  According to Plaintiff, "the ALJ failed to

27  articulate specific and legitimate reasons for rejecting" the opinions of these physicians.  (*Id.* at 15)

28  On the other hand, Defendant contends that "the ALJ gave good reasons supported by substantial

13

evidence explaining why she rejected the opinion of treating physician Dr. Joy Rodriguez and properly credited the opinion of examining physician Dr. Tha Cha."  (Doc. 23 at 5, emphasis omitted)

**A.      Evaluation of the Medical Record**

        In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).  In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability.  *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  Further, an examining physician's opinion is given more weight than the opinion of non-examining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

        A physician's opinion is not binding upon the ALJ, and may be discounted whether or not another physician contradicts the opinion.  *Magallanes*, 881 F.2d at 751.  An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying a "clear and convincing" reason.  *Lester*, 81 F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record."  *Id.*, 81 F.3d at 830.  When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict."  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).  Plaintiff contends the ALJ erred in her evaluations of the limitations assessed by Dr. Rodriguez, a treating physician, and Dr. Cha, examining physician.  Because the limitations were contradicted by other physicians—including Drs. Bobba and Frankel— the ALJ was required to identify specific and legitimate reasons for rejecting the opinions.

        1.      Opinion of Dr. Rodriguez

        The ALJ indicated she gave "little weight" to the opinion of Dr. Rodriguez that Plaintiff "was functionally capable of less than sedentary work activity."  (Doc. 11-3 at 22)  The ALJ found this opinion was contradicted by the treatment notes, inconsistent with the medical evidence, and based upon Plaintiff's subjective complaints.  (*Id.*)  Notably, the Ninth Circuit has determined these reasons may constitute specific and legitimate reasons for rejecting the opinion of a physician.  *See e.g.,*

1    *Tommasetti v. Astrue,* 533 F.3d 1035, 1041 (9th Cir. 2008) (an opinion may be rejected where an ALJ

2    finds incongruity between a doctor's assessment and his own notes, or is based upon a claimant's

3    reports that lack credibility); *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 602-03 (9th Cir. 1999)

4    (inconsistency with the record constitutes a legitimate reason for discounting a physician's opinion).

5                    *a.      Limitations based upon a claimant's subjective complaints*

6           The Ninth Circuit determined that an ALJ may reject an opinion predicated upon "a claimant's

7    self-reports that have been properly discounted as not credible." *Tommasetti,* 533 F.3d at 1041.  Thus,

8    the Court determined the ALJ set forth a specific and legitimate reason for rejecting a physician's

9    opinion where the limitations were based upon the claimant's subjective complaints and the claimant

10   lacked credibility. *Fisher v. Astrue*, 429 Fed. App'x 649, 652 (9th Cir. 2011).

11          The ALJ indicated she believed Dr. Rodriguez's "medical source statement [was] based

12   primarily on the claimant's subjective complaints as described when he visited her to complete his

13   'disability' paperwork."  (Doc. 11-3 at 22)  Notably, Plaintiff does not challenge the ALJ's adverse

14   credibility determination.  However, a review of the treatment notes from the day Plaintiff went to see

15   Dr. Rodriguez for disability paperwork reveals that some of the limitations came from Plaintiff's wife,

16   rather than Plaintiff.  It was Plaintiff's wife who reported that Plaintiff was "completely debilitated for

17   four days" after the functional capacity test, and observed him "in severe pain" after he tried to help

18   around the house.  (*See* Doc. 11-9 at 83)  On the other hand, it is unclear whether the limitations

19   regarding Plaintiff's ability to sit, stand, walk, and use his right hand came from Plaintiff or his wife.

20   (*See id.*)  Because the extent to which Dr. Rodriguez relied upon *Plaintiff's* reports is unclear, this is not

21   a specific and legitimate reason for giving less weight to the medical opinion.

22                    *b.      Conflicts with the treatment notes and record*

23          The Ninth Circuit has determined the opinion of a physician may be rejected where an ALJ

24   finds incongruity between limitations assessed by a physician and his or her own medical records, and

25   the ALJ explains why the opinion "did not mesh with [the] objective data or history." *Tommasetti,* 533

26   F.3d at 1041.  Likewise, inconsistency with the medical record as a whole constitutes a legitimate

27   reason for discounting a physician's opinion.  *Morgan*, 169 F.3d at 602-03. However, to reject an

28   opinion as inconsistent with the treatment notes or medical record, the "ALJ must do more than offer

                                                     15

his conclusions." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988).  The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required." *Id.*, 849 F.2d at 421-22.

When evaluating the opinion of Dr. Rodriguez, the ALJ noted:

> Although Dr. Joy Rodriguez provided a medical source statement indicating the claimant was functionally capable of less than sedentary work activity (Exhibit 12F), the undersigned gives this opinion little weight as her own treatment notes contradict and undermine this statement.  For example, on multiple examinations, Dr. Rodriguez documented the claimant moves all extremities well; his gait and station were normal; and his sensory function was intact (Exhibits 11F, pp. 2, 4, 6, 11, 13, 15, 17; 14F, p. 3). In addition, Dr. Rodriguez's statement is inconsistent with the other objective opinions of record and the clinical progress as documented by his treating orthopedist.

(Doc. 11-3 at 22)  Thus, the ALJ met her burden to identify specific findings in the treatment notes that are inconsistent the conclusion that Plaintiff could do less than sedentary work.  Although the ALJ did not identify specific inconsistencies with other opinions in the medical record, inconsistencies with Dr. Rodriguez's treatment notes alone supports the ALJ's decision to give "little weight" to her opinion. *See Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (treating physician's opinion properly rejected where the physician's treatment notes "provide no basis for the functional restrictions he opined should be imposed on [the claimant]").

### 2.    Opinion of Dr. Cha

Dr. Cha concluded, "Overall the patient should be able to perform light duties at an occasional level or sedentary duties frequently."  (Doc. 11-9 at 70) Plaintiff asserts that "the ALJ erred by failing to properly evaluate [this] opinion."  (*Id.*)  According to Plaintiff, "Dr. Cha's opinion indicates that Mr. Pendergast can perform light duties for up to 33 percent of the workday <u>or</u> sedentary work up to 66 percent of the workday.  Dr. Cha's opinion does not indicate that he can do both on the same day." (Doc. 14 at 13, emphasis in original)  In addition, Plaintiff argues, "Dr. Cha's opinion suggests that Mr. Pendergast cannot sustain work due to his inability to work a complete eight-hour workday at either level."  (*Id.*)

On the other hand, Defendant contends the ALJ made a "reasonable" interpretation of this statement in finding that "Plaintiff could 'lift and/or carry 20 pounds occasionally and 10 pounds

16

frequently.'" (Doc. 23 at 9)  Defendant observes: "the regulations explain that light work requires 'lifting no more than 20 pound at a time' while sedentary requires lifting 'no more than 10 pounds at a time.'"  (*Id.*, quoting 20 C.F.R. § 404.1567(a), (b))  According to Defendant, the ALJ's residual functional capacity "tracks Dr. Cha's opinion of occasional light and frequent sedentary and is furthermore consistent with the doctor's own testing findings."  (*Id.*)

        While the ALJ acknowledges the disputed conclusions of Dr. Cha, she does not explain her interpretation of the evidence.  The Court is unable speculate as to the grounds for the ALJ's conclusions or the ALJ's interpretation of the evidence.  *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225-26 (9th Cir. 2009) (the Court cannot speculate regarding the ALJ's conclusions or engage in "*post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking").  Regardless, it is apparent that the ALJ rejected limitations identified by Dr. Cha, who opined Plaintiff had limitations with reaching overhead and forward, could never be required to balance due to losing his balance upon testing, and could only knee occasionally.  (*Compare* Doc. 11-9 at 70, 79 *with* Doc. 11-3 at 21, 24)  Despite the fact that the ALJ purported to give "great weight" to the opinion of Dr. Cha, she did not identify specific and legitimate reasons for rejecting these limitations.[3]

        Given the failure of the ALJ to offer her interpretation of the evidence and to identify specific and legitimate reasons for rejecting limitations assessed by Dr. Cha, she failed to apply the proper legal standards in evaluating the opinion.

**B.      Remand is Appropriate**

        The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court.  *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).  Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation.  *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S.

---

        [3] The ALJ addressed Plaintiff's ability to balance and kneel, stating Plaintiff's "testimony regarding his activities of daily living and exertional questionnaire responses suggest he is able to perform certain postural activities such as balancing and kneeling frequently."  (Doc. 11-3 at 24)  However, the ALJ does not identify any specific testimony in support of this conclusion, and the Court has located none in its review of the hearing testimony or the exertional questionnaire.  To the contrary, Plaintiff testified that he could only get "bend [his] knees and get on the ground" for 15 minutes each day.  (Doc. 11-3 at 47)  Consequently, this is not a specific and legitimate reason for rejecting the limitations assessed by Dr. Cha. Regardless, the ALJ does not identify *any* reason for rejecting the reaching limitations.

12, 16 (2002)).  Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).  In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed.  *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

The ALJ failed to explain her interpretation of Dr. Cha's conclusions, or to identify specific and legitimate reasons for rejecting limitations that Dr. Cha assessed following the functional capacity testing.  These limitations are intertwined with the ALJ's residual functional capacity determination and the vocational expert's testimony regarding whether an individual with Plaintiff's limitations could perform work in the local or national economy. Therefore, the matter should be remanded for the ALJ to re-evaluate the medical evidence and determine Plaintiff's physical residual functional capacity.

## CONCLUSION AND ORDER

For the reasons set forth above, the Court finds the ALJ erred in his evaluation of the medical record, and the Court should not uphold the administrative decision.  *See Sanchez*, 812 F.2d at 510. Accordingly, the Court **ORDERS**:

1.     The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and

2.     The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Bryan Russell Pendergast and against Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   __July 17, 2017__                        _____ /s/ Jennifer L. Thurston
                                                   UNITED STATES MAGISTRATE JUDGE

18